UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ROBERT C. JACKSON and<br>COLETTE JOHNSTON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:14-cv-00193-TWP-DML |
| | ) | |
| THE LEADER'S INSTITUTE, LLC, and<br>DOUG STANEART, | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY ON CROSS MOTIONS FOR SUMMARY JUDGMENT

The parties' cross motions for summary judgment are before the Court.  Plaintiffs, Robert Jackson ("Jackson") and Colette Johnston (" Johnston") (collectively, the "Plaintiffs"), filed this action contending that Defendants were their employers and they are entitled to unpaid overtime pay under the Fair Labor Standards Act ("FLSA").  Defendants, Doug Staneart ("Staneart") and The Leader's Institute, LLC ("TLI") (collectively, the "Defendants"), deny that they were employers of either Plaintiff, and assert that Plaintiffs were independent contractors not subject to relief under the FLSA. Defendants filed a Motion for Summary Judgment or Alternatively for Partial Summary Judgment (Filing No. 61).  Thereafter, Plaintiffs filed a Cross-Motion for Summary Judgment and Response in Opposition to Defendants' Motion for Summary Judgment (Filing No. 74).  For the following reasons, both motions are **DENIED**.

## I.  BACKGROUND

The facts in this case are heavily disputed by the parties.  The Background section of this Entry is limited to those facts which the Court identifies as uncontested.  The contested facts, which

far outweigh the uncontested facts, are presented in greater detail in the Discussion section of this Entry.

TLI is a business that specializes in team building events and corporate seminars that provide public speaking classes and leadership courses throughout the United States. Staneart is the owner, president, chief executive officer, and managing officer of TLI. During the relevant time period, Staneart worked from his home office in Arlington, Texas and TLI did not have a separate physical location.

Jackson worked for TLI from December 2006 to January 2009, and from November 2010 to July 2013. He worked for the seminar division of the business, making sales and presenting trainings and team building programs. When making sales, Jackson worked from his home in Indianapolis, Indiana. When presenting trainings, he travelled to meet the corporate clients and often presented in hotel conference rooms. Jackson was paid on a commission-only basis.

Johnston began providing services for TLI in 2008 when she lived in Nashville, Tennessee. She worked for the Defendants from January 2008 to July 2013. Johnston worked as both an inside salesperson and presenter/trainer of programs sold by TLI. When making sales, Johnston worked from her home office in Florida. She was paid on a commission–only basis.

The parties agree that the relevant time period for any FLSA damages sought is from February 10, 2011 to July 31, 2013. Both Jackson and Johnston allege that during that time period, they regularly worked over 40 hours per seven-day week but were never paid overtime by TLI. Jackson seeks $66,324.03 and Johnston seeks $61,884.49 in back overtime wages. Defendants maintain that Jackson and Johnston were independent contractors rather than employees, therefore, neither is entitled to overtime pay.

## II. <u>LEGAL STANDARD</u>

Summary judgment is only appropriate by the terms of Rule 56 where there exists "no genuine issue as to any material facts and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. This notion applies equally where, as here, opposing parties each move for summary judgment in their favor pursuant to Rule 56. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774 (7th Cir. 1996). Indeed, the existence of cross-motions for summary judgment does not necessarily mean that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., Inc. v. Int'l Union of Operating Eng'rs*, 335 F.3d 643, 647 (7th Cir. 2003). Rather, the process of taking the facts in the light most favorable to the non-movant, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. "With cross-motions, [the court's] review of the record requires that [the court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration Forums, Ins.*, 246 F.3d 975, 983 (7th Cir. 2001) (quoting *Hendricks–Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

A court is not permitted to conduct a paper trial on the merits of a claim and may not use summary judgment as a vehicle for resolving factual disputes. *Ritchie v. Glidden Co., ICI Paints World-Grp.*, 242 F.3d 713, 723 (7th Cir. 2001); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Indeed, a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("these are jobs for a factfinder"); *Hemsworth*, 476 F.3d at 490. Instead, when ruling on a summary judgment motion, a court's responsibility is to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. *Id.*

### III. <u>DISCUSSION</u>

The issues before the Court are the following:  first, the parties dispute whether Jackson and Johnston are properly characterized as employees or independent contractors.  Second, the parties dispute whether Plaintiffs' employment is exempt from the FLSA under the Commissions exemption.  Third, the parties dispute whether the Plaintiffs are entitled to liquidated damages and a three year statute of limitations.

**A.**     <u>**The Fair Labor Standard Act**</u>

The FLSA establishes minimum wage, overtime pay, recordkeeping, and child labor standards affecting full-time and part-time workers in the private sector and in federal, state, and local governments.  The FLSA defines an employee simply as "any individual employed by an employer."  29 U.S.C. § 203(e)(1).  An "employer" is defined to include "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).  To "[e]mploy includes to suffer or permit to work."  29 U.S.C. § 203(g).  It is well recognized that under the FLSA the statutory definitions regarding employment are broad and comprehensive in order to accomplish the remedial purposes of the FLSA.  *See, e.g., United States v. Rosenwasser,* 323 U.S. 360, 362-63, 65 S.Ct. 295, 296, 89 L.Ed. 301 (1945); *Real v. Driscoll Strawberry Associates, Inc.,* 603 F.2d 748, 754 (9th Cir.1979).  Courts, therefore, have not considered the common law concepts of "employee" and "independent contractor" to define the limits of the FLSA's coverage.  We are seeking, instead, to determine "economic reality." *Brock v. Mr. W Fireworks, Inc.,* 814 F.2d 1042, 1043 (5th Cir.1987); *Karr v. Strong Detective Agency, Inc.,* 787 F.2d 1205, 1207 (7th Cir.1986).

**B.**      **Employees versus Independent Contactors**

The issue of whether Jackson and Johnston are properly characterized as employees or independent contractors is hotly contested and presents numerous disputes of material fact and significant credibility questions that preclude summary judgment for either party.

Whether an individual is an employee or an independent contractor under the FLSA depends on the application of the economic realities test, which is intended to clarify whether employees are actually dependent upon the business to which they render service. *Sec'y of Labor, U.S. Dep't of Labor v. Lauritzen*, 835 F.2d 1529, 1534 (7th Cir. 1987); *Scott v. NOW Courier, Inc.*, No. 1:10-cv-971-SEB, 2012 WL 1072751, at *7 (S.D. Ind. Mar. 29, 2012); *Perez v. Super Maid, LLC*, 55 F. Supp. 3d 1065, 1076 (N.D. Ill. 2014).

To assess the economic realities of a working relationship, courts consider the following six factors: (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; and (6) the extent to which the service rendered is an integral part of the alleged employer's business. *Lauritzen*, 835 F.2d at 1534-35; *NOW Courier, Inc.*, 2012 WL 1072751, at *7.

These criteria are intended to assist in determining the true nature of the relationship, but no criterion is by itself, or by its absence, dispositive or controlling. *Lauritzen*, 835 F.2d at 1534; *Perez*, 55 F. Supp. 3d at 1076. Instead, courts are to consider all the circumstances of the work activity rather than a particular isolated factor. *Lauritzen*, 835 F.2d at 1534; *see also Vanskike v.*

*Peters*, 974 F.2d 806, 808 (7th Cir. 1992) ("status as an 'employee' for purposes of the FLSA depends on the totality of the circumstances rather than on any technical label").

While the ultimate conclusion regarding whether an individual is an employee or an independent contractor is a question of law, the "historical findings of fact that underlie the findings" and "the findings as to the six factors" are questions of fact. *Lauritzen*, 835 F.2d at 1535 (citing *Brock v. Mr. W. Fireworks, Inc.*, 814 F.2d 1042, 1044-45 (5th Cir. 1987) and *Karr v. Strong Detective Agency, Inc.*, 787 F.2d 1205, 1206 (7th Cir. 1986)). *But see Lauritzen*, 835 F.2d at 1542 (Easterbrook, J., concurring) ("If we are to have multiple factors, we also should have a trial. A fact-bound approach calling for the balancing of incommensurables, an approach in which no ascertainable legal rule determines a unique outcome, is one in which the trier of fact plays the principal part"); *Narayan v. EGL, Inc.*, 616 F.3d 895, 901 (9th Cir. 2010) (quoting *Lauritzen* concurring opinion) ("[t]he drawing of inferences from subordinate to 'ultimate' facts is a task for the trier of fact-if, under the governing legal rule, the inferences are subject to legitimate dispute.").

In addition, as is true when resolving any summary judgment motion, issues concerning the credibility of witnesses and weight of the evidence are questions of fact which require resolution by the trier of fact. *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1170 (7th Cir. 1162) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986)); *Payne v. Milwaukee Cnty*, 146 F.3d 430, 433 (7th Cir. 1998) ("[w]hen a case turns on credibility, neither side is entitled to judgment as a matter of law unless objective evidence shows that it would be unreasonable to believe a critical witness for one side"); *Emery v. Nat'l Life & Accident Ins. Co.*, 614 F. Supp. 167, 170 (S.D. Ill. 1985) ("In every case, the [c]ourt must be sure that the opposing party's entire version is before the [c]ourt and that such issues as credibility and demeanor would not aid in the court's determination.").

The parties raise material factual disputes regarding the amount of control TLI and Staneart had over personnel-related decisions, the Plaintiffs' work schedules, Johnston's sales calls and the making of customer contracts, and Jackson's training presentations. The Court will briefly note the competing facts, as presented by the parties, in relation to the six *Lauritzen* factors.

### 1. **The nature and degree of the alleged employer's control as to the manner in which the work is to be performed.**

Of the six factors, the employer's right to control is the most important when determining whether an individual is an employee or an independent contractor. *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378 (7th Cir. 1991). Where a defendant exercises pervasive control over the operation as a whole, the control factor indicates an employment relationship. *See Lauritzen*, 835 F.2d at 1536. Stated differently, evidence displaying an employer's dominance over the "manner and method" of how work is performed suggests control by an employer. *Perez*, 55 F. Supp. 3d at 1076; *Solis v. Int'l Detective & Protective Serv., Ltd.*, 819 F. Supp. 2d 740, 750 (N.D. Ill. 2011); *Harper v. Wilson*, 302 F. Supp. 2d 873, 878 (N.D. Ill. 2004); *see also Villareal v. El Chile, Inc.*, 776 F. Supp. 2d 778, 786-87 (N.D. Ill. 2011) ("control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA, since such limitation on control does not diminish the significance of its existence.").

### a. **Defendants' control over personnel-related decisions**

The Plaintiffs allege that Staneart had control over all personnel-related decisions. This included the authority to manage TLI's daily affairs, the authority to control and maintain employment records, and the authority to make hiring and firing decisions. Additionally, the Plaintiffs claim that Defendants required them to maintain telephone voice mail greetings which identified them as TLI representatives; that the Defendants gave the Plaintiffs email addresses which included the "leadersinstitute.com" in the domain name and which included "TLI" in the

signature block; and that the Defendants issued business cards to the Plaintiffs identifying them as representatives of TLI.

Defendants contest Plaintiff's assertions and respond that Staneart did not control or maintain employment records; they did not have anything to do with "the design, creation, or content" of the Plaintiffs' email signature block; and they never issued or paid for the Plaintiffs' business cards.

### b.   Defendants' control over the Plaintiffs' work schedules

The Plaintiffs additionally allege that Staneart had the authority to control their work schedules, including time off and vacation time; and they assert that Staneart prohibited them from making changes to their work schedules.  They also assert that Staneart required them to work after hours; and they contend that the Defendants required them to create articles and blog posts in their free time.

Defendants respond that Plaintiffs set their own work hours and schedules, asserting that "nobody really had any control over how [the Plaintiffs] did their jobs or when they did their jobs". Instead, the Plaintiffs set their own work schedules, including time off and Staneart never prohibited the Plaintiffs from changing their work schedules.  The Defendants also refute that they required the Plaintiffs to work after hours, arguing that the Plaintiffs' decision to do so was motivated by the Plaintiffs' "desire to increase their profits" rather than in response to a requirement by the Defendants.  Further, although the Defendants concede that they initially required the Plaintiffs to write blog posts about their training presentations, they discontinued the practice midway through the Plaintiffs' employment.

In addition, the Defendants note that Johnston conducted all her sales services from her home office in Florida, making it impossible for Staneart to control her schedule from his home

office in Arlington, Texas.   Similarly, the Defendants assert that Jackson set his training presentation schedule, which varied by time and location, making it impossible for Staneart to control.  While the parties engaged in weekly conference calls, the Defendants assert that such calls were "never about [the Plaintiff's] method of selling or delivering events or classes".

Finally, although the Defendants concede that they required the Plaintiffs to participate in weekly "lead days", wherein the Plaintiffs were required to respond to customer sales inquiries over a 24 hour period, the Plaintiffs remained in control of their lead day schedules.  In particular, Defendants contend that Plaintiffs chose which hours to answer customer inquiries and were otherwise free to "go out to lunch, cook, mow [the] yard, sleep, run errands or participate in any other chosen activity."

### c.      **Defendants' control over Ms. Johnston's sales calls and the making of customer contracts.**

Next, Plaintiffs assert that the Defendants controlled the way Johnston conducted her sales calls.  The Plaintiffs also contend that the Defendants controlled all sales contracts with customers. In support, Plaintiffs note that once a sale was made, TLI sent sales proposals and form contracts to the customers.  Plaintiffs additionally assert that TLI required that customers use TLI-created form contracts, which Plaintiffs did not have authority to materially alter.  In addition, Plaintiffs contend that Defendants set the customer fee rates and the respective commission rates for each sale.

In contrast, Defendants respond that although Staneart provided sales "tips" to Johnston, they never monitored or evaluated Johnston's sales calls and had no way of enforcing Staneart's suggestions.   Further, Johnston's sales calls required uncontrollable skills, such as building relationships and rapport with the clients.  In addition, the Plaintiffs' job was to negotiate customer contracts and the Plaintiffs regularly executed customer contracts on their own.  Defendants

additionally counter that Johnston, not TLI, created and sent marketing proposals to 778 customers, noting that the Defendants only sent 287 marketing proposals to customers and each at Johnston's request.  The Defendants also contend that form contracts were not always used, as the clients often insisted on using their own contracts.  Finally, Defendants assert that Plaintiffs made material alterations to every contract, including changes to the customer fee, the date of delivery, the scope of the work, and the terms of payment.

### d.   Defendants' control over Jackson's training presentations.

Finally, Plaintiffs assert that the Defendants had control over the scheduling of trainers for presentations and control over the method that Jackson used to present his trainings.  Defendants counter that Staneart only scheduled trainers 20% of the time and the rest of the presentation schedule was controlled by the Plaintiffs.  In addition, although Defendants admit that Jackson received six months of training before he was certified to present trainings on behalf of TLI, they did not require Jackson to use a particular style or script when making his presentations.  Instead, the unique needs of each client required flexible and adaptable presentations. Further, Defendants never monitored or evaluated Jackson's presentations.

Although the ultimate determination regarding the nature of the parties' relationship is a question of law, the Court cannot grant summary judgment for either party on this issue because the parties' competing factual histories and inferences are material to each of the six factors of the economic realities test and because this Court cannot resolve credibility issues raised in a summary judgment motion.  Indeed, in their reply briefs, both parties ultimately resort to a line-by-line, "he-said/she said" format to emphasize the differing factual accounts and opposing factual inferences. (*See, e.g.*, Filing No. 82 at 2-17; Filing No. 87 at 7-11.)  Both parties assert, on at least one occasion in the briefing, that credibility questions may likely preclude summary judgment on the issue.

(*See, e.g.*, Filing No. 82 at 26-27 ("Alternatively, the Court should deny both summary judgment motions, finding the disputed facts require it to judge the credibility of witnesses at trial in ruling on the nature of the parties' relationship"); Filing No. 87 at 5 ("Defendants improperly invite the Court to engage in credibility determinations at the summary judgment stage").)   The Court agrees and summary judgment is denied on this issue.

### 2. The alleged employee's opportunity for profit or loss depending upon his managerial skill.

Regarding the second factor, the parties raise material factual disputes in relation to which party exerted greater control over access to new customer leads, the extent to which the Defendants set customer fees and commission rates, and the risk of loss actually borne by the Plaintiffs.

An independent contractor risks loss of an investment and has the opportunity to increase profits through managerial discretion. *Harper*, 302 F. Supp. at 879; *Perez*, 55 F. Supp. 3d at 1077; *see also Morse v. Mer Corp.*, No. 1:08-cv-1389-WTL, 2010 WL 2346334, at *4-5 (S.D. Ind. June 4, 2010) (considering whether the alleged employee's "initiative" and "hustle" drew more customers to the business than the alleged employer's advertising and marketing, and considering whether the alleged employee was exposed to more potential loss than the alleged employer through investment or otherwise).

When a worker is paid a commission of the profits, courts often find that the worker has the opportunity to increase profits based on the worker's management skills, judgment, and initiative. *See, e.g.*, *Kady v. Beg*, No. 1:08-cv-1156-SEB, 2010 WL 2291832, at *4 (S.D. Ind. June 2, 2010); *Strom v. Strom Closures, Inc.*, No. 06 C 7051, 2008 WL 4852998, at *5 (N.D. Ill. Nov. 7, 2008) (holding that this factor tilted toward independent contractor status when the worker was paid commissions, giving the worker the potential to earn more than a weekly salary).  In contrast, strict prearranged pay scales and situations that do not afford workers "managerial discretion" to

adjust their hours or work more efficiently eliminate the opportunity for workers to realize increased profits by adjusting their own performance. *Perez*, 55 F. Supp. 3d at 1077; *see also Morse*, 2010 WL 2346334, at *4 (noting that where the alleged employer controlled customer volume, the alleged employees were "far more akin to wage earners toiling for a living, than to independent entrepreneurs seeking a return on their risky capital investments.").

### a. <u>Access to new customer leads.</u>

Plaintiffs argue that the Defendants controlled access to new customer leads, as all sales leads were automatically provided through the Defendants' InfusionSoft software. While Defendants admit that the bulk of new customer leads were provided through TLI's software, they assert that Plaintiffs also obtained a significant amount of new customer leads on their own initiative. For example, Defendants point to Johnston's independent marketing efforts through LinkedIn and Google AdWords and her investment of additional time and effort to promote a new TLI market in San Francisco and San Jose, California. Similarly, Defendants argue that Jackson attracted new customer leads by performing well in his training presentations and by having drinks with customers after events. Finally, the Defendants note that, because the Plaintiffs were paid on commissions, they had a financial incentive to independently attract new customer leads.

### b. <u>Defendants' control over customer fees and commission rates.</u>

Plaintiffs also note that the Defendants set all customer fee rates and the corresponding commission rate for each sale or presentation made by the Plaintiffs, making it impossible for the Plaintiffs to boost their profit margins. Defendants do not dispute that they set the customer fee rates and the corresponding commission rates but argue that Plaintiffs had incentives to find new customers and to "upsell" their existing customers by selling them additional training events.

        c.      **Plaintiffs exposure to potential loss.**

In addition, the Plaintiffs argue that they bore little risk of loss because most of their work materials were provided by the Defendants. In particular, although Plaintiffs admit that they supplied most of their home office equipment, they note that the Defendants provided advertising, marketing materials, software, customer leads, form contracts, presentation materials, travel expenses, administrative support, trainings, company business cards, and company email addresses. The Defendants respond that Plaintiffs were both paid solely on commissions, exposing them to significant risk of loss. Additionally, Defendants point out that the Plaintiffs' expenditures on home office materials were not *de minimis*.

Because the material facts are disputed, summary judgment is not appropriate for either party on this factor.

        **3.**      **The alleged employee's investment in equipment or materials required for his task, or his employment of workers.**

Regarding the third factor, the parties repeat many of the same material factual disputes raised in relation to the second factor. Large personal investments are more representative of an independent contractor than an employee. *Perez*, 55 F. Supp. 3d at 1077. Such investments include "large expenditures, such as risk capital, or capital investments, and not negligible items or labor itself." *Lauritzen*, 835 F.2d at 1537; *Perez*, 55 F. Supp. 3d at 1077.

Plaintiffs assert that this factor weighs in their favor because Staneart admitted that he invested more money into TLI's business operations than the Plaintiffs. Defendants respond that the Plaintiffs' personal investments were significant and they cite to issues raised in relation to the second factor. Because these material facts are disputed, summary judgment is not appropriate for either party on this factor.

4.    __Whether the service rendered requires a special skill.__

Regarding the fourth factor, the parties raise a material factual dispute regarding whether the Plaintiffs' sales and presentation work required specialized skills.  "Skills are not the monopoly of independent contractors," and all jobs require some modicum of skill.  *Lauritzen,* 835 F.2d at 1537; *Perez v. Super Maid, LLC*, 55 F. Supp. 3d 1065, 1077 (N.D. Ill. 2014); *Jaworski v. Master Hand Contractors, Inc.*, No. 09 C 07255, 2013 WL 1283534, at *5 (N.D. Ill. Mar. 27, 2013); *Harper*, 302 F. Supp. 2d at 879 (holding that an alleged employer's training that merely developed basic managerial skills was not sufficiently specialized to tilt this factor towards independent contractor status).  However, highly specialized skills weigh in favor of independent contractor status. *Jaworski*, 2013 WL 1283534, at *5; *Perez*, 55 F. Supp. 3d at 1077.

Plaintiffs assert that no particular skills or prior experience are required to make sales calls and conduct training presentations, and the Plaintiffs note that the Defendants provided specialized training on how to conduct their work. The Defendants refute both contentions.  In particular, Defendants respond that the Plaintiffs were specifically hired because of their extensive sales and presentation experience.  Defendants assert that they never trained Johnston on sales calls and only provided "tips" regarding various sales topics.  Similarly, Defendants assert that, although Jackson was given six months of training, the training was limited to the substantive topics of developing empathy with customers and encouraging customer confidence; and Jackson had to rely on his untrainable personality skills to actually deliver the training presentations.  Defendants also contend that both of the Plaintiffs' positions required specialized "soft skills" in "communication and understanding personality styles" which helped them to succeed at their jobs.  Accordingly, the disputed material facts prevent summary judgment for either party on this factor.

14

**5.**     **The degree of permanency and duration of the working relationship.**

With respect to the fifth factor, the parties raise a material factual dispute regarding whether the Plaintiffs were at liberty to work for other companies.  The more permanent the relationship, the more likely the worker is to be an employee.  *Perez*, 55 F. Supp. 3d at 1078; *Solis*, 819 F. Supp. 2d at 752.  Plaintiffs assert that their tax returns demonstrate that they worked exclusively for TLI during the relevant time period because all of their income was through their work at TLI.  In addition, Plaintiffs note that after they left their employment with TLI, the Defendants attempted to enforce a non-compete agreement against them, further suggesting that they were not at liberty to work for other companies.

The Defendants counter that the Plaintiffs' tax forms, which were filed on IRS Form 1099s, suggest that the Plaintiffs classified themselves as independent contractors.  Defendants note that the Plaintiffs' tax forms show that the Plaintiffs funneled their profits from TLI through the third party companies that they owned, ShortSplice and Magnavo, suggesting that they did not consider themselves to be employees of TLI.  Further, while the Defendants do not refute that they attempted to enforce a non-compete agreement against the Plaintiffs, they contend that Plaintiffs were free to work for other companies that did not directly compete with TLI.  Summary judgment is thus not appropriate based on these disputed facts.

**6.**     **The extent to which the service rendered is an integral part of the alleged employer's business.**

Regarding the sixth factor, Defendants concede that the services provided by Plaintiffs were an integral part of Defendants' business.  Individuals are more likely to be employees if they perform "the primary work of the alleged employer."  *Perez*, 55 F. Supp. 3d at 1078; *Harper,* 302 F. Supp. 2d at 879.  This factor examines the nature of the work performed and asks whether that work constitutes an "essential part" of the alleged employer's business.  *Harper,* 302 F. Supp. 2d

at 879 (N.D. Ill. 2004); *see, e.g., Lauritzen,* 835 F.2d at 1537-38 (holding that migrant pickle harvesters were integral to the business because they were an essential link in the eventual sale of the pickles). However, the Defendants argue that this factor should not be controlling.

In sum, the competing facts and inferences are extensive in regards to each *Lauritzen* factor. Such competing facts require credibility determinations that cannot be resolved pursuant to competing summary judgment motions. Accordingly, this Court considers it inappropriate to grant summary judgment on the issue of whether Jackson and Johnston are properly characterized as employees or independent contractors.

**B.    FLSA Commissions Exemption.**

The second issue, whether the Plaintiffs' employment is exempt from the FLSA under the Commissions exemption, is premature, given the sufficient factual disputes that exist regarding whether the Plaintiffs are properly considered employees. Further, the parties present additional issues of material fact and significant credibility issues that preclude summary judgment on this issue. The FLSA requires an employer engaged in interstate commerce to pay its employees at least one and a half times their normal hourly wage for any hours they work in excess of forty hours a week. 29 U.S.C. § 207(a)(1). However, Congress has exempted certain employees from the overtime pay rule when, (1) the worker's regular pay exceeds one and a half times the federal minimum wage; (2) more than half the worker's compensation for a representative period represents commissions on goods or services; and (3) the worker is employed by "a retail or service establishment." 29 U.S.C. § 207(i).

The FLSA is a remedial act and exemptions from its coverage are to be narrowly construed against employers. *Klein v. Rush–Presbyterian-St. Luke's Med. Ctr.*, 990 F.2d 279, 282 (7th Cir. 1993); *Alvarado v. Corp. Cleaning Serv., Inc. (Alvarado I)*, 719 F. Supp. 2d 935, 942 (N.D. Ill.

16

2010).   However, that presumed narrow construction is employed only as a "tie-breaker" in extremely close cases.  *Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1177 (7th Cir. 1987); *Alvarado I*, 719 F. Supp. 2d at 942.   Finally, the employer bears the burden of proving the applications of an exemption.  *Klein*, 990 F.2d at 283; *Alvarado I*, 719 F. Supp. 2d at 942. The Court will address these factors in turn.

### 1.   Whether the Plaintiffs' pay exceeded one and a half times the federal minimum wage.

Defendants use the Plaintiffs' alleged hours worked per week to determine the number of individual pay periods (paid by TLI every two weeks), and assert that the Plaintiffs were paid at least one and a half times the federal minimum wage.  (*See* Filing No. 62 at 37-48) (citing *Kuntsmann v. Aaron Rents, Inc.*, 903 F. Supp. 2d 1258, 1267-68 (N.D. Ala. 2012).)  Defendants' calculations would not be problematic if the Plaintiffs did not object to them.  However, as with most issues in this case, the Plaintiffs object to the Defendants' calculations.  (*See* Filing No. 87 at 16.)  Even though it appears that Defendants based their calculations on Plaintiffs' own estimates of their average hours worked per week, the Plaintiffs assert that there is a significant dispute regarding the number of hours they actually worked.   Specifically, Plaintiffs note that the Defendants did not keep a record of the hours that they worked per pay period.  Notably, however, the Plaintiffs do not assert in their briefing that they themselves actually kept records of the hours that they worked per pay period.  Seizing on this lack of evidence, and significantly undercutting their own calculations, the Defendants assert multiple times that a trial is necessary to determine the actual number of hours the Plaintiffs worked per pay period.  (*See* Filing No. 62 at 38 n.4, 51, Filing No. 82 at 27.)  Plaintiffs argue that, instead of a trial to determine the actual number of hours they worked in each given pay period, the Defendants should be precluded from asserting the Commissions exemption because Defendants failed to keep records as required by 29 C.F.R. §

516.16.  However, "this failure alone does not itself invalidate an otherwise applicable exemption."

*See Alvarado v. Corp. Cleaning Serv., Inc. (Alvarado II)*, No. 07 C 0661, 2013 WL 6184044, at

*9 n.8 (N.D. Ill.  Nov. 18, 2013) (quoting Dep't of Labor, Wage & Hour Div., *Field Operations Handbook* § 21h01 (July 12, 1990)).

Instead, given this mutually acknowledged issue of fact and its clear materiality to this *overtime* dispute, the Court agrees that a trial is necessary to determine the number of hours actually worked by the Plaintiffs per pay period and whether the Plaintiffs were paid one and a half times the federal minimum wage.

**2.**   **Whether more than half of the Plaintiffs' compensation represents commissions on goods or services.**

The parties additionally dispute whether Plaintiffs were paid by commissions. Plaintiffs' position is somewhat puzzling, as they state that both Jackson and Johnston were "paid on a commission-only basis", Filing No. 74 at 11, and repeatedly discuss their pay in terms of commissions throughout their briefs.  Nevertheless, the Plaintiffs assert, "solely for the purpose of the retail or service establishment exemption analysis, . . . . Plaintiffs dispute that their pay was on a commission basis, and state that their pay is thus "effectively hourly" pursuant to the definition of these terms in "*Alvarado*."  The seemingly contradictory description of the payment system is troubling.  Nevertheless, as explained below, the Seventh Circuit recently articulated a new test for determining "commission" based payment system, exclusive of the party's terminology. Further, it is the Defendants' burden to establish the Commissions exemption.

How each party names the compensation system is not determinative.  *Alvarado v. Corp. Cleaning Serv., Inc. (Alvarado III)*, 782 F.3d 365, 367 (7th Cir. 2015).  Instead, determining whether a plaintiff was paid on a commission basis is determined by the facts of the case.  *See, e.g.*, *Id*. at 377-69.  Specifically, the Seventh Circuit explains that the analysis involves examining

whether the plaintiff was paid based on sales and whether the plaintiff worked irregular hours, which more likely demonstrates a non-uniform rate of pay.  *See Id*.

Applying this test, Defendants focus their attention on the compensation structure for Jackson's presentations.  The parties do not dispute that Jackson was paid per presentation and that his presentation schedule depended entirely on individual client bookings.  This scenario is similar to the commission based compensation structure in *Alvarado III*.  *Id*. at 377-69 (window washers were paid per building contract and the window washers' work hours were determined by the seasonal needs of the customers).  As such, it appears that Jackson was paid based on commissions for his presentations. However, Defendants do not explain which hours Jackson was paid for presentations and which hours Jackson was paid for making sales.  Accordingly, from the evidence submitted, it is impossible to determine whether Jackson was paid at least 50% based on commissions.

Further complicating matters, the Defendants do not present any arguments or evidence regarding the compensation structure for the Plaintiffs' sales.  While it appears that Plaintiffs were also paid per sale, potentially satisfying the first *Alvarado III* factor, it is entirely unclear whether Plaintiffs made sales pursuant to irregular hours, the second and "more important" *Alvarado III* factor.  As previously discussed, the parties dispute how many hours the Plaintiffs worked making sales and whether the Plaintiffs conducted "lead day" sales calls according to hours set by the Defendants or based on the Plaintiffs' own prerogatives. While it may be possible for Defendants to establish this element at trial, the Court cannot grant summary judgment at this juncture.

### 3.      TLI, as the Plaintiffs' employer, was a "retail or service establishment".

The Seventh Circuit recently eliminated the more complex analysis for determining "retail or service establishment" but did not articulate a clear substitute test.  Specifically, when faced

with similar factual arguments to those presented by both parties in this case, the Seventh Circuit

explained,

> [The party asserting the exemption] attempt[s] to define a "retail or service establishment" by listing factors of dubious relevance, such as that "75 per centum of its annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry," 29 C.F.R. § 779.312, or that the establishment "serves the everyday needs of the community in which it is located." 29 C.F.R. § 779.318. We don't see the connection between these criteria and the reasons for excusing certain employers from the overtime provision of the Fair Labor Standards Act. . . .

> It's no surprise, by the way, that there is no connection. The . . . definition comes from section 213(a)(2), which as we've noted was the intrastate business exemption. This definition made sense in that context: if Congress's purpose was to exempt local mom and pop stores from wide-sweeping federal labor legislation (and not just from the overtime requirement), courts would want to ensure that most of the local stores' output would remain within the state—in other words that they are operating on a small scale in the community. The Department of Labor and some courts . . . have woodenly ported the definition from section 213(a)(2) to the commission exemption with no sensitivity to the very different purpose of that exemption.

*Alvarado v. Corp. Cleaning Serv., Inc. (Alvarado III)*, 782 F.3d 365, 369-71 (7th Cir. 2015)

(internal citations omitted). Accordingly, many of the factual arguments presented by the parties

in relation to this element of the Commission exemption are not relevant to this Court's analysis.

Instead, based on the factual discussions of *Alvarado III*, it appears that TLI is properly

characterized as a retail or service establishment. Like the window washing service in *Alvarado III*, TLI primarily sells training, public speaking, and team building programs for corporate entities

throughout the United States. While the parties vigorously dispute the percentage of TLI's annual

sales that came from training-related materials as opposed to the trainings themselves, based on

the conclusions of *Alvarado III*, this argument no longer appears relevant to the analysis. *See Id*.

Further, like the window washing service in *Alvarado III*, no evidence or argument has been

presented to suggest that TLI is a wholesaler.  Consequently, the Court can at least conclude that this element of the Commissions exemption is met.

Nevertheless, it is only one element; and the Defendants have, therefore, not met their burden of establishing the Commissions exemption.  As a result, summary judgment is not appropriate on this issue.

In sum, the parties present additional issues of material fact on this issue which require credibility determinations that cannot be resolved pursuant to a summary judgment motion. Accordingly, the Court finds it inappropriate to grant summary judgment on the issue of whether Plaintiffs' employment is exempt from the FLSA under the Commissions exemption.

### C.    <u>Liquidated Damages and a Three Year Statute of Limitations.</u>

The third issue, whether the Plaintiffs are entitled to liquidated damages and a three year statute of limitations, is also premature; and summary judgment is precluded because of the additional material fact issues presented by the parties.

Under the FLSA, an employer who violates the overtime compensation provision is liable to the employee in the amount of the unpaid compensation as well as "in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b).  Liquidated damages are mandatory for FLSA violations "unless the district court finds that the defendant-employer was acting in good faith and reasonably believed that its conduct was consistent with the law." 29 U.S.C. § 260; *Shea v. Galaxie Lumber & Constr. Co., Ltd.*, 152 F.3d 729, 733 (7th Cir. 1998); *Solis*, 819 F. Supp. 2d at 754; *see also Pautlitz v. City of Naperville*, 874 F. Supp. 833, 835 (N.D. Ill. 1994) (noting that, in order to prove good faith, a defendant-employer must show that it took "active steps" to investigate the requirements of the FLSA).  Determining "good faith" involves a mixed question of law and fact,

as it requires both factual determinations and legal application.  *See Jackson v. Go-Tane Servs., Inc.*, 56 F. App'x 267, 273 (7th Cir. 2003).

In addition, the FLSA provides for a two year statute of limitations for violations of the statute.  29 U.S.C. § 255(a).  However, that time period may be extended to three years if the plaintiff proves that the defendant's conduct was in willful violation of the law.  29 U.S.C. § 255(a); *Bankston v. State of Ill.*, 60 F.3d 1249, 1253 (7th Cir. 1995).

As established by the extensive factual disputes regarding the Plaintiffs' status as employees versus independent contractors, it is impossible at this juncture to determine whether Defendants actually violated the FLSA.  Even if the Court could resolve that threshold issue, the parties dispute additional material facts regarding whether Defendants acted in good faith or in willful disregard of the FLSA.

For instance, Defendants assert that there is no evidence that they had actual knowledge they were violating the FLSA because Staneart did not know what the FLSA was before the Plaintiffs' lawsuit.  Defendants argue they did not act willfully or in reckless disregard of the FLSA because they thought they had properly characterized the Plaintiffs as independent contractors.  In support, the Defendants note that when TLI was first started, Staneart researched IRS regulations and believed he was in compliance with the five-step test that "would determine whether or not from the IRS's perspective if somebody was an employee or an independent contractor." Defendants argue that Staneart's good faith belief was further bolstered by the decision of a Florida Administrative Law Judge in 2013, characterizing a former TLI worker as an independent contractor for purposes of unemployment benefits.

In contrast, the Plaintiffs assert that Staneart failed to seek the advice of a lawyer, an accountant, or a government agency to determine whether he was in compliance with the FLSA in

22

classifying the Plaintiffs as independent contractors, showing both willfulness and reckless disregard of the FLSA's requirements.

Such competing facts require credibility determinations that cannot be resolved in a summary judgment motion. Indeed, even Plaintiffs concede that credibility issues likely preclude summary judgment on this issue. (*See* Filing No. 87 at 20) ("At the very least, Plaintiffs have raised a fact issue for trial on the issue, as mere awareness of overtime being worked raises fact question for trial.".) Accordingly, summary judgment is denied on this issue as well.

## IV. <u>CONCLUSION</u>

For the reasons stated above, Defendants' Motion for Summary Judgment or Alternatively for Partial Summary Judgment (Filing No. 61) is **DENIED**, and Plaintiffs' Cross-Motion for Summary Judgment and Response in Opposition to Defendants' Motion for Summary Judgment (Filing No. 74) is **DENIED**.

     **SO ORDERED.**

Date: 11/24/2015

_____

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Allen R. Vaught
BARON & BUDD, PC
avaught@baronbudd.com

Michael Rabinowitch
WOODEN & MCLAUGHLIN LLP
mrabinowitch@woodmclaw.com

Maureen E. Ward
WOODEN & MCLAUGHLIN LLP (Indianapolis)
mward@woodmclaw.com